## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

| | | |
|---|---|---|
| Lisa Julin | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.: 1:13−cv−09075 |
| | ) | |
| Advanced Equities, Inc., | ) | Honorable James F. Holderman |
| Advanced Equities Financial | ) | |
| Corporation, Jeffery Alan Binkert, Does 1-15) | | |
| | ) | Magistrate Judge Susan E. Cox |
| Defendants. | ) | |

_____

### FIRST AMENDED COMPLAINT

Plaintiff LISA NICOLE JULIN, by and through her attorney, Neil Kelley, for her

complaint against Defendants ADVANCED EQUITIES, INC.; ADVANCED EQUITIES

FINANCIAL CORPORATION; JEFFREY ALAN BINKERT, Individually; and DOES 1-15;

upon information and belief states as follows:

### NATURE OF ACTION

1.      This is an action against the Defendants for promissory fraud, breach of contract,

breach of the implied covenant of good faith and fair dealing, interference with prospective

economic advantage, violation of the Illinois Wage Payment & Collection Act, violation of the

Title VII and the Fair Labor Standards Act, conversion, unjust enrichment, an accounting, sex

discrimination, sexual harassment, slander, retaliation, failure to supervise, and respondeat

superior, in connection with Plaintiff LISA NICOLE JULIN'S prior employment as a Managing

Director at Defendant investment brokerage firm ADVANCED EQUITIES, INC., a subsidiary

of Defendant ADVANCED EQUITIES FINANCIAL CORP.  By this action, LISA NICOLE

JULIN seeks, *inter alia*, compensatory damages, statutory damages, punitive damages,

attorneys' fees and costs, and any other remedy to which she may be entitled to in law or equity,

as available.

## **PARTIES**

2.      LISA NICOLE JULIN ("Plaintiff") is an individual residing in Cook County, Illinois.

3.      Plaintiff is informed and believes that Defendant ADVANCED EQUITIES, INC. ("AEI") is an Indiana Corporation, with its principal place of business and headquarters located in Chicago, Cook County, Illinois.  AEI is a brokerage firm and an investment adviser firm.  AEI has been registered with the Securities Exchange Commission as a broker-dealer pursuant to Section 15 of the Exchange Act since 1993, and as an investment adviser pursuant to Section 203 of the Advisers Act since 2007.  AEI is no longer registered with the Financial Industry Regulatory Authority ("FINRA").  AEI is a wholly-owned subsidiary of ADVANCED EQUITIES FINANCIAL CORPORATION.

4.      Plaintiff is informed and believes that Defendant ADVANCED EQUITIES FINANCIAL CORPORATION ("AEFC") is a Delaware Corporation, with its principal place of business and headquarters located in Chicago, Cook County, Illinois.  AEFC is the parent entity of AEI.

5.      Plaintiff is informed and believes that Defendant JEFFREY ALAN BINKERT is an individual residing in Walworth County, Wisconsin.  At all relevant times herein, Defendant BINKERT was employed by AEI as a Senior Managing Director and Team Captain of Plaintiff's investment sales team.  Binkert is joined pursuant to Federal Rule of Civil Procedure 19 as an indispensible party to this action.

6.      The true names and capacities, whether individual, corporate, associate, or otherwise of Defendants sued as DOES 1 through 15, inclusive, are unknown to Plaintiff, who therefore sues such Defendants by fictitious names.  Plaintiff will seek leave of Court to amend this Complaint to allege their true names and capacities when they have been ascertained. Plaintiff is informed, believes, and on that basis alleges, that each of the fictitiously named Defendants is responsible to Plaintiff for the injuries and damages alleged, and/or is subject to the jurisdiction of this Court as a necessary party for the relief sought herein.

7.      Plaintiff is informed, believes, and on that basis alleges that at all relevant times, each Defendant was the agent, employee, joint venturer, successor, shareholder, director, officer and/or partner of each of the remaining Defendants, and in doing the things alleged herein, were acting within the scope of their authority as such agents, employees, joint venturers, successors, shareholders, officers, directors and/or partners of each of the remaining Defendants.

8.      Plaintiff is informed, believes, and on that basis alleges that at all relevant times, that Defendant AEI was at all times the agent, alter ego, and/or servant of AEFC and each of the fictitious Defendants, and in doing the things hereinafter alleged, the Defendants formed a one unity of interest and ownership corporation. The corporations are a joint enterprise and thus, if the acts in question are treated as those of one corporation alone it will cause an inequitable result herein.  This is evidenced by:

  a. On information and belief, AEFC does not engage in business on its own behalf, but instead acts through wholly owned subsidiaries, of which AEI is an example.

  b. AEFCs only business actions are to directly control and manage the activities of its subsidiaries.

  c. On information and belief, all past and present presidents of AEI also sit or have sat on the AEFC board of directors including both Byron Crowe and Keith Daubenspeck.

  d. On information and belief, all past and present principals of AEI also sit or have sat concurrently on AEFCs board of directors including both Dwight Badger and Keith Daubenspeck..

  e. On information and belief, all past and present CEOs of AEI also have sat or sit on AEFCs board of directors.

  f. Other miscellaneous high-ranking officers including but not limited to COO Ron Piasecki sits or concurrently sat on AEFCs board of directors.

**JURISDICTION AND VENUE**

9. Jurisdiction is proper under 28 U.S.C. §1331 because the major underlying claim relies upon Title VII, a federal law.

10. Venue is proper under 28 U.S.C. §1391 because the defendants' main offices are in the Northern District of Illinois, and all the actions described herein took place in the Northern District of Illinois.

## GENERAL ALLEGATIONS

11. Plaintiff is an investment professional, with over 13 years experience. Plaintiff is a registered investment adviser with the Securities Exchange Commission ("SEC") and FINRA, and holds a broker-dealer registration in California, Florida, Kentucky, Michigan, and Illinois, where she is also registered as an investment adviser representative. Plaintiff maintains the following licenses with FINRA (previously known as the National Association of Securities Dealers or "NASD"): Series 7 (General Securities Representative), Series 63 (State Securities Agent), and Series 66 (Investment Adviser and Broker).

12. AEFC is a diversified financial services organization, providing private equity placements for emerging companies in technology, health care, and the biotech fields.

13. At all times relevant herein, AEI was and is a wholly-owned subsidiary of AEFC. AEI is a venture capital firm specializing in late-stage private equity, primarily in the U.S. technology sector.

### Plaintiff Interviews And Is Hired For A Position At AEI

14. In early 2009, Plaintiff interviewed for a position as an investment adviser at AEI. Plaintiff had been previously employed by Morgan Stanley in a similar capacity, where she was a member of the top producing team in the company's Chicago office.

15. During the interview process with AEI, Plaintiff was informed that the available position was on a team consisting of Senior Managing Director BINKERT and Managing Director Christopher Patrick Gambino (the "Binkert Team").

16. Plaintiff met with BINKERT and Mr. Gambino on several occasions prior to accepting employment with AEI. Both BINKERT and Mr. Gambino told Plaintiff during four

separate interviews that, upon generating $10,000,000 in investment revenue, the following four key events would occur: (1) she would be made an equity partner on the Binkert Team, at which point the three members would split team earnings equally; (2) she would receive a promotion in title; (3) she would share in revenues from over two hundred team accounts; and (4) she would receive inherited accounts from departed brokers. The terms of this oral agreement were the critical determining factor in Plaintiff's decision to accept AEI's offer of employment.

17.     In addition to the oral agreement made by AEI's representatives, BINKERT and Mr. Gambino, Plaintiff also entered into a written agreement with AEI, signed by its then President, Byron Crowe, and dated January 23, 2009 ("Employment Contract").

18.     Pursuant to the terms of the Employment Contract, Plaintiff was entitled to the following, among other benefits and terms of employment:

    a.  A minimum of 3% commission for investments that Plaintiff generated, of $1,000,000 or more, in any company for which AEI served as a placement agent;

    b.  A minimum of 8% commission for investments that Plaintiff generated, in an LLC formed by AEI which invested in any company for which AEI served as a placement agent;

    c.  Warrants to purchase shares in investee companies; and

    d.  A share of back-end fees received by AEI from investors in investments made by LLC's formed by AEI.

19.     Excited about the opportunity for growth and potential at AEI, Plaintiff accepted the offer of employment with AEI's Chicago office, and executed the Employment Contract on January 29, 2009. Plaintiff's hire date was February 2, 2009.

20.     Upon information and belief, Plaintiff was the only female adviser working for AEI when she was hired, and throughout the balance of her employment.

21.     During Plaintiff's tenure at AEI, all senior employees and upper level management were male.

**Plaintiff Begins Employment At AEI**

22.     At AEI, Plaintiff's job duties as an Investment Executive included developing and managing investment opportunities in private companies for high net-worth individuals.  As her supervisor, BINKERT instructed Plaintiff to identify potential clients and manage the relationships in order to secure investments.  However, BINKERT made it clear that he was the one who would close the deals.

23.     Plaintiff was given an individual account number for deals that she introduced to the Binkert Team.  For these deals, she was informed that she was to receive 100% commission on the accounts she worked exclusively, and a 50% commission split on accounts that the Binkert Team worked on (BINKERT and Mr. Gambino would each receive 25%).

24.     Plaintiff spent substantial time visiting various clients to cultivate relationships. She also utilized her industry experience, resources, and significant personal client contacts for the benefit of AEI and AEFC.

25.     Plaintiff's most successful account was raising funds for Fisker Automotive, Inc. ("Fisker").  In September 2009, Plaintiff entered into an agreement titled the "Fisker Compensation Agreement" with AEI and/or AEFC, which outlined the terms of her compensation with respect to certain investments related to Fisker (the "Fisker Agreement").

26.     Pursuant to the terms of the Fisker Agreement, Plaintiff was entitled to the following, among other terms, if she executed and delivered the Fisker Agreement "on or prior to the 25th day of September, 2009":

> a.   "Gross commissions for the sale of Fisker will be five percent (5%) for all
>      Direct Sales (sales of Fisker Series A-1 Convertible Preferred Stock) and ten
>      percent (10%) of all Indirect Sales (sale of AEI Fisker Investments I, LLC and
>      AEI Fisker II, LLC.)"

27.     Plaintiff executed the Fisker Agreement on September 18, 2009, and delivered the Fisker Agreement on or before September 25, 2009.

28.     As a result of her hard work and dedication, Plaintiff quickly became one of AEI's top 15 new advisers.  Plaintiff was recognized by the other brokers as a "high performer" who brought in a lot of money for AEI.  In fact, Plaintiff successfully met her goal of bringing in $10,000,000 of investment revenue to AEI by February 2010—within just one year of her joining the firm.

**<u>Plaintiff is Subjected to Discrimination During her Employment</u>**

29.     Plaintiff's happiness at AEI was unfortunately short lived.  As Plaintiff's employment progressed, BINKERT showed signs that he was not interested in working with her, but rather, his goal was to steal her clients.

30.     For example, in July 2009, BINKERT told one of Plaintiff's clients during several phone calls that she was incompetent, would not be with AEI for long, and had only been hired to introduce clients to AEI.  BINKERT was also placing Plaintiff's clients under his individual account number.  When Plaintiff questioned BINKERT about his actions, he became angry and forced her to back down, as he would yell and scream at her.

31.     Plaintiff quickly learned that BINKERT was difficult to work with.  He constantly insulted and demeaned Plaintiff and tried to take control of her clients.  He would often speak to her in an angry tone, demanding to know where she was at all times, and forcing her to not contact or speak to her own clients.  BINKERT went so far as to ban Plaintiff from coming into the office for a period after she failed to copy him on an e-mail.  BINKERT also instructed Plaintiff not to use the assistant assigned to her and the other members of the Binkert Team.

32.     Despite Plaintiff's demonstrated high performance, BINKERT continued his abusive behavior.  He would criticize Plaintiff, telling her she was never good enough, and that she was a female with a "target on her back."  BINKERT also cursed at Plaintiff more than 100 times during her employment.  Plaintiff did not observe BINKERT treating other brokers, including her teammate, Mr. Gambino, in the same manner.

33.     In addition to being her direct supervisor, BINKERT was also Captain of Plaintiff's team, and in that capacity, was given authority and control over her commission

income.  Significantly, despite reaching her $10,000,000 investment revenue goal by February 2010, BINKERT denied Plaintiff equity partnership with the Binkert Team.  Instead, BINKERT and Mr. Gambino retained the Plaintiff's equity.

34.    Plaintiff was also denied a promotion in title at that time, and never received the promised revenue share.  However, upon information and belief, Mr. Gambino was promoted to Managing Partner within one year of joining the Binkert Team and provided with an equity partnership, despite generating less than $10,000,000.

35.    Although Plaintiff remained one of the top performing brokers at AEI, she was suffering from the constant mistreatment.  Plaintiff was diagnosed with extreme hyperthyroidism, which her doctor indicated had been caused by stress.

36.    In May 2010, BINKERT hired another adviser, Christopher Struck, onto the Binkert Team.  Plaintiff was never informed about the hire, and was excluded from the Binkert Team commission split on accounts involving Mr. Struck.  Plaintiff later learned that Mr. Struck's employment agreement contained far more favorable terms than hers.

37.    In December 2010, BINKERT hired another adviser, Brian Czupek, onto the Binkert Team.  Plaintiff was never informed about the hire, and was excluded from the Binkert Team commission split on accounts involving Mr. Czupek.  Plaintiff later learned that Mr. Czupek's employment agreement contained far more favorable terms than hers.

38.    Plaintiff was also prevented, with few exceptions, from using her individual accounts, and was required to split deals 50/50.  BINKERT also prevented her from receiving inherited client accounts from advisers who had left AEI.  On December 18, 2010, Plaintiff reported this to Senior Managing Director Mr. Kozak, but he stated that it was up to the team if they wanted to share with her or not.

39.    In February 2011, Plaintiff scheduled a team call to discuss her compensation and partnership agreement.  She informed BINKERT and Mr. Gambino that she was:  (a) being compensated at a low level with respect to the Binkert Team commission splits; (b) the terms of their partnership changed as she does not share in the Binkert Team revenues as promised and

did not receive any inherited accounts; and (c) BINKERT hired new team members without Plaintiff's knowledge, for purposes of subverting her meaningful participation (financial and otherwise) on the team and treat the other, male, brokers more favorably.

40.    BINKERT finally agreed to a better split for her individual accounts: 70% Plaintiff, 15% BINKERT, and 15% for Mr. Gambino.  However, the negotiation was hard fought, and BINKERT and Mr. Gambino informed management that she was acting "greedy" and "selfish."

41.    On March 18, 2011, Plaintiff discovered that her clients who had invested in BrightSource Energy were cut back by 42%.  Upon information and belief, other male advisers' clients were allowed to invest at 100%.  This resulted in $9,000 of lost commissions to Plaintiff.

42.    Plaintiff considered leaving the Binkert Team, but other Team Captains were unwilling to take her after BINKERT made disparaging and false comments about the quality of her work product and her attitude.

43.    In November 2011, Plaintiff again approached Mr. Kozak about BINKERT's treatment and was met with aversion.  Mr. Kozak acknowledged and apologized for BINKERT's behavior, but in essence, told Plaintiff, "too bad."

44.    Plaintiff was now placed in an extremely difficult position.  She had been developing contacts in order to raise capital for her biggest account, Fisker, since August 2009. Plaintiff was also promised warrants and back-end commission on the Fisker account, and BINKERT and Mr. Gambino had her client list.  If Plaintiff left AEI, she would lose her hard earned commissions and warrants, and leave with nothing.

45.    On January 31, 2012, Regional Sales Manager David Shawn Rogers informed Plaintiff that she had finally received a promotion to Managing Director.  Mr. Rogers also confirmed that Plaintiff was one of the top producers at AEI, and had increased her production by 60.72% from 2010 to 2011.  The promotion was long overdue, as Plaintiff was supposed to have received it two years prior, upon meeting her $10,000,000 revenue goal in February 2010.

46.     Plaintiff discovered that the promotion was in title only, and had no impact on her compensation.  In addition, Plaintiff was not offered a Team Captain position, which, upon information and belief, was a position lesser performing male advisers were offered.  AEI's failure to provide Plaintiff with the Team Captain position directly impacted her compensation, as Team Captains made additional commission from the deals made by the advisers on their team.

47.     In February 2012, Plaintiff was told by a fellow adviser in AEI's Chicago office that BINKERT, Mr. Gambino, and Senior Managing Director Mr. McDonnell, set up an account with one of her primary clients, and excluded Plaintiff from any commission split.  When Plaintiff attempted to attend an event to generate potential revenue for that client, BINKERT refused to let her attend.

48.     Plaintiff also discovered that BINKERT had taken another one of her key clients' investments and put them under BINKERT's account number.

49.     Plaintiff waited until the April 2012 commission split to confirm the information she had received about BINKERT, Mr. Gambino, and Mr. McDonnell specifically excluding her from commissions to which she was entitled, and stealing clients.  When Plaintiff checked the April 2012 split, she had in fact received no portion of the commissions from her client's investment.

50.     Plaintiff also learned that she was not being treated the same as the other brokers at AEI's Chicago office, who, upon information and belief, were all male.  For example:

      a.  Plaintiff never received inherited accounts, although the male brokers frequently received them;

      b.  The Binkert Team's prior 50/50 commission split was not typical, and the other teams at AEI had 60/40 or 70/30 splits;

      c.  Plaintiff's clients were rejected or limited from investing in potentially lucrative opportunities in Fisker, Bloom Energy, and Bright Source Energy,

which were offered to the clients of lesser performing male brokers.  This
resulted in lost commissions of at least $37,500;

d.  Less qualified male brokers were given secondary equity pieces, in at least
three instances:  (i) Mr. Rogers gave an $860,000 secondary equity piece to
male advisers, including BINKERT, Mr. Gambino, and Mr. Kozak, but
excluded Plaintiff; (ii) AEI senior official, and former President, Michael
Dockendorf, gave secondary equity pieces carrying the potential for $100,000
in commissions to two male brokers, neither with a track record as strong as
Plaintiff's; (iii) BINKERT failed to give Plaintiff a portion of a $12 million
dollar secondary equity piece carrying the potential for between $72,000 and
$144,000 in commissions.  When Plaintiff discovered that she was excluded
from a yet another secondary equity piece, she demanded her fair share. Mr.
Rogers acquiesced and offered her $500,000 of the multimillion dollar
secondary equity piece, but only one day prior to the deadline for her clients
to invest, effectively eliminating her chance to participate;

e.  Less qualified male brokers were provided more favorable contract terms than
Plaintiff upon hire, including no payback of a draw, and no "Redline"
provision (which limited Plaintiff's ability to receive a monthly draw);

f.  Plaintiff was treated less favorably than male brokers with respect to receiving
a promotional change in title and awards;

g.  Plaintiff was treated less favorably than male brokers with respect to receiving
less time to fill orders and close deals;

h.  Plaintiff was not provided with the same access to support staff as male
brokers; and

i.  Plaintiff was treated less favorably than male brokers with regards to her
expense account and reimbursement of expenses, of which she is still owed
approximately $6,000.

**Plaintiff Informs AEI Management About Her Unfair Treatment**

51.    On April 16, 2012, Plaintiff told AEI CEO Dwight Badger and Mr. Crowe, AEI's Chief Financial Officer, about BINKERT's discriminatory and unethical conduct towards her. Plaintiff specifically requested that AEI Management instruct BINKERT to cease and desist from contacting her clients, and asked to be moved to a new team.  Plaintiff also requested that her conversation with Mr. Badger and Mr. Crowe be kept confidential, for fear of retaliation. Mr. Badger told Plaintiff that he would investigate.

52.    Later that day, Mr. Rogers told Plaintiff that she had indeed been improperly left off the ASC FL account, and that she would receive $4,500 in retroactive pay in her next paycheck.  Upon information and belief, Plaintiff had been left off the account as a direct result of BINKERT's actions.  Also upon information and belief, Mr. Rogers was previously aware that Plaintiff was excluded from the account commissions, but never reported it or otherwise took action.

53.    Despite Plaintiff's request to keep the matter confidential, word of Plaintiff's complaint immediately spread throughout the office.  As Plaintiff feared, BINKERT retaliated. That same day, BINKERT sent Mr. Rogers an e-mail incorrectly indicating that Plaintiff was not opening accounts, and demanding a restructure of the commission split.  BINKERT told another employee that Plaintiff would not be with AEI much longer.

54.    On April 17, 2012, Plaintiff told Mr. Badger that she wanted her commissions paid, her expenses reimbursed, BINKERT reprimanded, and her clients removed from the Binkert Team and placed under her individual number.  Once again, Plaintiff requested that AEI Management instruct BINKERT to cease and desist contacting her clients and for AEI to investigate her complaint.  Plaintiff also asked to receive inherited accounts and secondary offerings like the male brokers.  Not long after, Plaintiff did receive some inherited accounts, but they were largely worthless.

55.     On April 23, 2012, BINKERT sent Plaintiff multiple requests to meet with him regarding issues they have been "meaning to address."  Fearful of meeting with BINKERT, Plaintiff declined.

56.     On April 24, 2012, BINKERT informed Barbara Hon, AEI's Human Resources Director, that he was displeased with Plaintiff's performance on the Binkert Team.

57.     On April 25, 2012, Plaintiff reported BINKERT's misconduct to AEI's Chief Operating Officer and Board Member, Ron Piasecki.  Mr. Piasecki told Plaintiff the following:

      a.   AEI had not properly monitored BINKERT;

      b.   BINKERT was concealing information from team members;

      c.   BINKERT and AEI had unethically stolen her accounts; and

      d.   AEI would investigate and pay Plaintiff 100% for any accounts BINKERT had stolen from her.

58.     However, AEI took no action against BINKERT.

59.     Also on April 25, 2012, Plaintiff learned from another adviser that Senior Managing Directors Mr. Kozak and Mr. Capra told him that she "sleeps with clients for her business."  This was false.  Mr. McDonnell also said that Plaintiff "flirted" for her business. This was false.

60.     At all relevant times herein, Plaintiff was engaged to be married.

61.     On May 11, 2012, Plaintiff learned that Mr. Gambino contacted Plaintiff's recruiter and informed him that Plaintiff wanted more money, and that she was not working out on the Binkert Team.  This was false.

62.     On May 25, 2012, Mr. Kozak also said that Plaintiff "flirted" for her business, and that she "does nothing" at work.  This was false.

63.     Plaintiff ultimately left the Binkert Team.  In addition, Mssrs. Czupek and Struck also left the Binkert Team.  On a recorded call on June 5, 2012, BINKERT told another team captain that if Plaintiff and Mssrs. Czupek and Struck thought they would be able to take "these

accounts, they're wrong" and that BINKERT "convinced the firm not to fire them." BINKERT also stated that he preferred to not have a team, claiming that "it's nothing but a pain in the ass."

64.    Although Plaintiff removed herself from the Binkert Team, AEI did not sever the financial ties, and BINKERT was still receiving commission from her clients. BINKERT also received more inherited accounts. Instead of disciplining BINKERT, AEI rewarded his behavior.

65.    On June 10, 2012, Plaintiff again reported BINKERT's improper conduct to AEI Management. Plaintiff met with Ms. Hon, AEI's Human Resources Director, complained about BINKERT regarding the partnership percentage issues, theft of her clients and accounts, and unfavorable treatment in comparison with male brokers. Plaintiff also reported the harassing and slanderous comments made by Mr. Capra, Mr. Kozak, and Mr. McDonnell. Plaintiff informed Ms. Hon that she had previously complained to AEI Management, but they failed to address the issue.

66.    On June 12, 2012, Ms. Han, and AEI's General Counsel, Amal Amin, met with Plaintiff. They told her that she was a good performer and asked if she wanted to join another team. They also told her they were still investigating her complaint. Plaintiff responded that she wanted the results of the investigation before deciding on next steps.

67.    A partial investigation was initiated, during which it was discovered that other AEI employees had informed Human Resources about Plaintiff's harassment complaint. However, upon information and belief, the investigation did not address promotion/title issues or the harassing conduct toward Plaintiff.

### **Plaintiff Is Retaliated Against For Exposing The Discrimination**

68.    After making her complaint to Human Resources, Plaintiff learned from her clients that BINKERT was still contacting them.

69.    On June 12, 2012, Plaintiff was excluded from participating in an important meeting regarding Fisker.

70.     On June 14, 2012, Plaintiff learned from one of her clients that BINKERT had scheduled a call with him, without Plaintiff's knowledge.

71.     On June 18, 2012, Mr. Czupek called Plaintiff and asked if she was "suing the firm," because he had heard this information from two AEI advisers.  On June 21, 2012, Plaintiff's headhunter contacted her and stated that Mr. Gambino informed him that she "filed a complaint against AEI" and was "suing the firm."  This was false.

72.     Also on June 21, 2012, Plaintiff received a call from a client who stated that BINKERT was trashing her reputation.

73.     On June 27, 2012, AEI's junior In House Counsel, Greg Ward, and Ms. Hon met with Plaintiff.  They informed Plaintiff that, after a "full" investigation, AEI found no wrongdoing or discrimination.  Mr. Ward told plaintiff that only one unspecified account had been misdirected.  He also attributed Plaintiff's complaints to "a personality conflict."  Plaintiff expected AEI to provide her with written findings, but Mr. Ward refused.  Mr. Ward informed Plaintiff that she could go out on her own or join another team.  He also offered her a promotion to Team Captain.

74.     On July 16, 2012, Plaintiff asked Mr. Ward for resolution of all the unpaid warrants and back-end compensation owed her.  Plaintiff received no response.  Instead, inherited accounts continued to be distributed to other, male, brokers.

75.     In August 2012, Plaintiff discovered that Mr. Dockendorf distributed a secondary debt piece worth $600,000 in commissions, but did not include her.  In addition, BINKERT falsely informed at least two of her clients that she was no longer employed by AEI and that client needed to work with BINKERT.

**Plaintiff Is Terminated**

76.     On August 16, 2012, Mr. Crowe asked Plaintiff whether she was leaving AEI, claiming that AEI had not heard from her following her meeting with Mr. Ward and Ms. Hon.  Plaintiff told him that she was still waiting for the formal results from the investigation.  Mr. Crowe told Plaintiff that she would not receive written findings and the investigation was over.

Mr. Crowe told Plaintiff that AEI needed to determine how to divide up the Binkert Team's joint accounts, and inquired whether she wanted to work as an independent contractor. Plaintiff was not prepared to answer immediately.

77.     In late August 2012, the ASC FL account was split 90% in favor of BINKERT, and only 10% in favor of Plaintiff. BINKERT was still continuing to disparage her to her clients, and the client attached to the ASC FL account was receiving information from BINKERT, and not Plaintiff.

78.     On September 4, 2012, another adviser told Plaintiff of the rumor that she was sleeping with clients for business. Plaintiff immediately informed Human Resources, and stated that it was defamatory and needed to stop. Plaintiff also informed Human Resources that AEI was becoming an increasingly difficult place to work. Upon information and belief, Human Resources did nothing to address the rumor.

79.     In early November 2012, AEI asked Plaintiff to attend a dinner at the last minute, in order to assist with diversity. The dinner was to court a securities firm that was interested in acquiring AEI. Plaintiff was the only female in attendance.

80.     On November 12, 2012, AEI conducted lay-offs, including Plaintiff. Upon information and belief, all management and the top advisers were informed of the lay-offs at least one week prior, except for Plaintiff.

81.     Upon information and belief, the top 10 advisers were allowed to remain at AEI, except for Plaintiff. All of the remaining advisers were male.

82.     Eventually, BINKERT, MR. Capra, Mr. Kozak, Mr. McDonnell, Mr. Gambino and Mr. Rogers left AEI for the Chicago office of venture capital firm Roth Capital Partners ("Roth"). Upon information and belief, those advisers took with them the remaining business of AEI, including certain of Plaintiff's clients.

83.     As a result of Defendants' discriminatory and harassing actions herein, including her unlawful retaliatory termination, Plaintiff has lost clients and has been unable to secure employment in the relatively small venture capital industry.

84.     On July 11, 2013, Plaintiff executed a Charge of Discrimination against AEI with the Equal Employment Opportunity Commission ("EEOC"), alleging the conduct complained of herein.  The Chicago District Office of the EEOC received the Charge of Discrimination on July 16, 2013.

85.     On September 20, 2013, Plaintiff received a Notice of Right to Sue from the EEOC.

## FIRST CAUSE OF ACTION

**(Fraud In The Inducement)**

**(Against AEI, AEFC, and BINKERT)**

86.     Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 85, inclusive, as though fully set forth herein.

87.     On no less than four separate occasions during the interview process, BINKERT and Mr. Gambino made specific false representations of material fact with respect to Plaintiff's ability to become an equity partner on the Binkert Team, upon generating $10,000,000 in investment revenue.

88.     Specifically, BINKERT and Mr. Gambino told Plaintiff that once she earned $10,000,000 in investment revenue, she would:  (a) become an equity partner on the team, and split team earnings equally (*i.e.*, a one-third split), (b) receive a promotion to Managing Director; (c) share in revenues from more than two-hundred team accounts; and (d) receive inherited accounts from departed brokers.

89.     Defendant BINKERT, and Mr. Gambino, knew that the representations set forth above and throughout this Complaint were false at the time they made them and/or acted with reckless disregard as to their truth.

90.     Defendant BINKERT, and Mr. Gambino, made the misrepresentations and/or concealed material information with the intent to induce Plaintiff to act in reliance on the misrepresentations.

91.     Plaintiff justifiably and reasonably relied on the presumed veracity of BINKERT's and Mr. Gambino's misrepresentations and/or concealments, and accepted employment at AEI.

92.     Plaintiff's justifiable and reasonable reliance was a substantial factor in causing Plaintiff injury, as upon earning $10,000,000 in revenue as of February 2010, she did not:  (a) become an equity partner on the team, and split team earnings equally (*i.e.*, a one-third split), (b) receive a promotion to Managing Director; (c) share in revenues from more than two-hundred team accounts; and (d) receive inherited accounts from departed brokers.

93.     But for Defendant BINKERT, and Mr. Gambino's, misrepresentations, Plaintiff would have not accepted employment at AEI.

94.     Defendants AEI and AEFC are equally liable for BINKERT's willful and malicious fraudulent inducement.  These misrepresentations furthered AEI's and AEFC's business at Plaintiff's expense, and were made in the course and scope of Defendant BINKERT's employment.

95.     Plaintiff is entitled to an award of compensatory damages against Defendants AEI, AEFC, and BINKERT in an amount according to proof at the time of trial, and any other relief the Court deems proper.

96.     The above alleged actions of Defendants were undertaken with fraud, malice and/or oppression, and were done with a conscious disregard of the rights of Plaintiff, and therefore, Plaintiff is entitled to an award of punitive damages against Defendants in an amount according to proof.

### SECOND CAUSE OF ACTION

**(Breach of Contract – Written, Oral and Implied)**

**(Against AEI, AEFC and BINKERT)**

97.     Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 96, inclusive, as though fully set forth herein.

98.     Plaintiff entered into an oral agreement with BINKERT and Mr. Gambino just prior to accepting her employment with AEI.  Pursuant to the terms of this agreement, upon Plaintiff generating $10,000,000 in investment revenue, the following four key events would occur:  (1) she would be made an equity partner on the Binkert Team, at which point the three members would split team earnings equally; (2) she would receive a promotion in title; (3) she would share in revenues from over two hundred team accounts; and (4) she would receive inherited accounts from departed brokers.  The terms of this oral agreement were the critical determining factor in Plaintiff's decision to accept AEI's offer of employment.

99.     The offer from BINKERT and Mr. Gambino was unambiguous, as was Plaintiff's acceptance of the offer.  BINKERT, Mr. Gambino and Plaintiff intended to be bound by the terms of the offer.

100.     In addition to the oral agreement made by AEI's representatives, BINKERT and Mr. Gambino, Plaintiff also entered into a written agreement with AEI, signed by its then President, Byron Crowe, and dated January 23, 2009 ("Employment Contract").

101.     Plaintiff executed the Employment Contract on January 29, 2009.

102.     Pursuant to the terms of the Employment Contract, Plaintiff was entitled to the following, among other benefits and terms of employment:

a.  A minimum of 3% commission for investments of $1,000,000 or more in any company for which AEI served as a placement agent;

b.  A minimum of 8% commission for investments in an LLC formed by AEI which invested in a company;

c.  Warrants to purchase shares in investee companies; and

d.  Share of back-end fees received by AEI from investors in investments made by LLC's formed by AEI.

103.     Plaintiff also executed and entered into the Fisker Agreement with AEI and/or AEFC on September 18, 2009.

104.    Pursuant to the terms of the Fisker Agreement, Plaintiff was entitled to the following, among other terms:

      a.    Gross commissions of 5% for all Direct Sales of Fisker Automotive, Inc. (sales of Fisker Series A-1 Convertible Preferred Stock); and

      b.    10% of all Indirect Sales (sale of AEI Fisker Investments I, LLC and AEI Fisker II, LLC).

105.    Plaintiff performed all obligations required of her under the Oral Agreement, Employment Contract and Fisker Agreement (collectively, the "Contracts"), including reaching $10,000,000 in investments in February 2010.  The Contracts were valid and enforceable.

106.    BINKERT, AEI and AEFC breached the Contracts by not providing Plaintiff with the enumerated benefits due and owing to her pursuant to the terms of those contracts.  These breaches included, but were not limited to:  failure to pay earned commissions, failure to make Plaintiff equity partner on the Binkert Team; failure to include Plaintiff in shares of over two hundred team accounts; and failure to provide Plaintiff with legitimate inherited accounts.

107.    The conduct of BINKERT, AEI and AEFC conduct as alleged throughout this Complaint also breaches the implied covenant of good faith and fair dealing implicit in the Contracts.

108.    As a result of BINKERT's, AEI's and AEFC's breach of the Contracts, Plaintiff sustained damages in amount according to proof at the time of trial, and any other relief the Court deems proper.

### THIRD CAUSE OF ACTION

**(Intentional Interference With Contractual Rights)**

**(Against BINKERT and DOES 1-15)**

109.    Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 108, inclusive, as though fully set forth herein.

110. Plaintiff entered into the Employment Contract with AEI and/or AEFC, signed by AEI's then President, Mr. Crowe, and dated January 23, 2009.

111. Plaintiff executed the Employment Contract on January 29, 2009.

112. Pursuant to the terms of the Employment Contract, Plaintiff was entitled to the following, among other benefits and terms of employment:

    a. A minimum of 3% commission for investments of $1,000,000 or more in any company for which AEI served as a placement agent;

    b. A minimum of 8% commission for investments in an LLC formed by AEI which invested in a company;

    c. Warrants to purchase shares in investee companies; and

    d. Share of back-end fees received by AEI from investors in investments made by LLC's formed by AEI.

113. Plaintiff also executed and entered into the Fisker Agreement with AEI and/or AEFC on September 18, 2009.

114. Pursuant to the terms of the Fisker Agreement, Plaintiff was entitled to the following, among other terms:

    a. Gross commissions of 5% for all Direct Sales of Fisker Automotive, Inc. (sales of Fisker Series A-1 Convertible Preferred Stock); and

    b. 10% of all Indirect Sales (sale of AEI Fisker Investments I, LLC and AEI Fisker II, LLC).

115. Plaintiff performed all obligations required of her under the Employment Contract and Fisker Agreement. The Employment Contract and Fisker Agreement were valid and enforceable.

116. Upon information and belief, during Plaintiff's employment at AEI, all employees of similar title and position to Plaintiff were required, upon hire, to enter into an employment agreement. Similarly, upon information and belief, during Plaintiff's employment at AEI, all employees of similar title and position to Plaintiff who would be working on Fisker related

investments were required to enter into a similar Fisker Agreement.  BINKERT was aware of the existence of the Employment Contract and Fisker Agreement.

117.    BINKERT intentionally and unjustifiably induced the breach of the Employment Contract and Fisker Agreement by AEI and AEFC, by interfering and, in most instances, preventing Plaintiff from receiving her contractually entitled payment of commissions and bonuses.  BINKERT's conduct included, but was not limited to:  the reassignment of client accounts to BINKERT's personal accounts and disparaging remarks made to Plaintiff's clients regarding her work product and employment at AEI.

118.    At the time of BINKERT's intentional interference, Plaintiff was entitled to receive the benefit of her contracts with AEI and AEFC.

119.    As a direct and proximate result of BINKERT's intentional and unjustifiable inducement of AEI and AEFC's breach of the Employment Contract and Fisker Agreement, Plaintiff was actually and proximately damaged in an amount in excess of this Court's minimum jurisdiction which will be determined according to proof at trial.

120.    The above alleged actions of Defendants were undertaken with fraud, malice and/or oppression, and were done with a conscious disregard of the rights of Plaintiff, and therefore, Plaintiff is entitled to an award of punitive damages against Defendants in an amount according to proof.

**FOURTH CAUSE OF ACTION**

**(Interference With Prospective Economic Advantage)**

**(Against BINKERT and DOES 1-15)**

121.    Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 120, inclusive, as though fully set forth herein.

122.    Plaintiff had a reasonable expectation of entering into valid business relationships with her clients, that she developed prior to and during her employment at AEI.  Plaintiff was

consistently a top 15 adviser at AEI during her employment, and brought in more than $40 million dollars worth of investment capital from her clients.

123.    Defendant BINKERT knew of the business relationships between Plaintiff and her clients because he was aware of all of Plaintiff's clients' investments with AEI and/or AEFC, such as the ASC FL investment vehicle.  In addition, BINKERT's role as Captain of the Binkert Team received a percentage of all of Plaintiff's commissions from her clients' investments. BINKERT also demanded that Plaintiff turn over all of her client contact information to him.

124.    BINKERT's purposeful interference with Plaintiff's prospective business relationships included, but were not limited to:  the reassignment of client accounts to BINKERT's personal accounts and disparaging remarks made to Plaintiff's clients regarding her work product and employment at AEI, prevented Plaintiff's legitimate expectancy from ripening into a valid business relationship with her clients.

125.    As a direct and proximate result of BINKERT's purposeful interference with Plaintiff's business relationships with her clients, Plaintiff was actually and proximately damaged in an amount in excess of this Court's minimum jurisdiction which will be determined according to proof at trial.

126.    In or around August and September 2012, Plaintiff also had a reasonable expectation of entering into a valid business relationship with top producing AEI Team Captain Gordon E. Fallone, following the closure of AEI.  Mr. Fallone worked out of AEI's San Francisco office, and repeatedly requested Plaintiff to join his team.  Mr. Fallone communicated to Plaintiff on numerous occasions his desire for Plaintiff to work with him.

127.    Defendant BINKERT knew of the prospective employment relationship between Plaintiff and Mr. Fallone.

128.    BINKERT's purposeful interference with Plaintiff's prospective business relationship with Mr. Fallone, including but not limited to, disparaging remarks made regarding Plaintiff's work product and employment at AEI, prevented Plaintiff's legitimate expectancy from ripening into a valid business relationship with Mr. Fallone.

129.    As a direct and proximate result of BINKERT's purposeful interference with Plaintiff's prospective business relationship with Mr. Fallone, Plaintiff was actually and proximately damaged in an amount in excess of this Court's minimum jurisdiction which will be determined according to proof at trial.

130.    The above alleged actions of Defendants were undertaken with fraud, malice and/or oppression, and were done with a conscious disregard of the rights of Plaintiff, and therefore, Plaintiff is entitled to an award of punitive damages against Defendants in an amount according to proof.

## FIFTH CAUSE OF ACTION

**(Violation of the Illinois Wage Payment & Collection Act, 820 ILCS 115/14)**

**(Against AEI, AEFC, BINKERT and DOES 1-15)**

131.    Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 130, inclusive, as though fully set forth herein.

132.    Defendants AEI and AEFC (collectively, the "Company Defendants") are "employers" within the meaning of the Illinois Wage Payment and Collection Act (WPCA), 820 ILCS 115/2.

133.    Defendant BINKERT is an "employer" within the meaning of the WPCA, 820 ILCS 115/13, as he is a corporate officer or agent who knowingly permitted violations of the WPCA.

134.    In January 2009, Plaintiff entered into the Employment Contract with AEI and AEFC, as well as an oral employment agreement with BINKERT (collectively, the "Employment Agreements").

135.    Plaintiff worked as a full-time, non-exempt employee at AEI from February 2009 until November 2012.

136.    Plaintiff was compensated primarily through commissions. Her base rate of pay was $1,972.00 per month. Pursuant to the terms of the Employment Contract, Plaintiff was

entitled to minimum commissions in the amount of 3% for investments of $1,000,000 or more in any company for which AEI served as a placement agent, and 8% for investments in an LLC formed by AEI which invested in a company. For deals that she introduced to the Binkert Team, Plaintiff was to receive 100% of the commission amount on the accounts she worked exclusively, and a 50% commission split on accounts that the Binkert Team worked on as a group, until November 2011. At that time, Plaintiff was entitled to 70% commission split on accounts she introduced, that the Binkert Team worked on as a group.

137.    With respect to commissions earned on Fisker related investments, pursuant to the terms of the Fisker Agreement, Plaintiff was to receive the following commission: 5% for all Direct Sales (sales of Fisker Series A-1 Convertible Preferred Stock) and ten percent (10%) of all Indirect Sales (sales of AEI Fisker Investments I, LLC and AEI Fisker II, LLC).

138.    Defendant BINKERT and Mr. Gambino also promised to pay Plaintiff a one-third equity share of the Binkert Team's earned commissions upon Plaintiff achieving $10,000,000.00 in investment revenue. Plaintiff achieved that goal in February 2010, however, BINKERT knowingly permitted Plaintiff to not receive an equity share of the Binkert Team's earned commissions, from at least February 2010 to November 2012.

139.    Pursuant to the Employment Contract, Plaintiff was also entitled to compensation in the form of warrants to purchase shares in investee companies, and a share of back-end fees received by AEI from investors in investments made by LLC's formed by AEI.

140.    The Company Defendants and BINKERT promised and agreed to pay Plaintiff her commissions and bonuses earned during the relevant time period, and pursuant to the WPCA, 820 ILCS 115/1 *et seq.*, Plaintiff is entitled to be paid for her earned commissions and bonuses, as well as her equity percentage share of the Binkert Team's commissions, pursuant to the Employment Agreements.

141.    Plaintiff also incurred approximately $6,000 in expenses which remain unpaid. The Company Defendants promised and agreed to reimburse Plaintiff for expenses incurred in connection with her employment, during the relevant time period, and pursuant to the WPCA,

820 ILCS 115/1 *et seq.*, Plaintiff is entitled to be reimbursed for her expenses, pursuant to that agreement.

142.     The Company Defendants have failed, neglected or refused to pay Plaintiff for all of her earned commissions, bonuses and incurred expenses, from February 2009 to November 2012, pursuant to 820 ILCS 115/4 and 5; and as a direct and proximate result thereof, Plaintiff has been damaged in an amount to be determined at trial.

143.     BINKERT, as an officer or agent of the Company Defendants, knowingly permitted the Company Defendants' failure, neglect or refusal to pay Plaintiff all of her earned commissions, bonuses and incurred expenses from at least February 2009 to November 2012, pursuant to 820 ILCS 115/4, 5 and 13; and as a direct and proximate result thereof, Plaintiff has been damaged in an amount to be determined at trial, and any other relief the Court deems proper.

144.     Plaintiff requests underpayment and damages of 2% per month, plus costs and attorneys' fees, pursuant to 820 ILCS 115/14.

145.     The above alleged actions of Defendants were undertaken with fraud, malice and/or oppression, and were done with a conscious disregard of the rights of Plaintiff, and therefore, Plaintiff is entitled to an award of punitive damages against these Defendants in an amount according to proof at trial.

### SIXTH CAUSE OF ACTION

**(Conversion)**

**(Against AEI, AEFC, BINKERT and DOES 1-15)**

146.     Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 145, inclusive, as though fully set forth herein.

147.     During her employment at AEI and AEFC, from February 2009 to November 2012, Plaintiff possessed and/or had the immediate right to property, including, but not limited to:

     a.  Monies due and owing for earned and unpaid commission payments and bonuses, including 3% - 8% commission on at least $30,000,000 in revenue earned by her clients' investments (minus approximately $600,000 paid to Plaintiff during her employment), improperly converted by BINKERT, Mr. McDonnell, and Mr. Gambino; and

     b.  Unpaid client and job related expense reimbursements of approximately $6,000.

148.    Defendants AEI, AEFC, BINKERT, along with Mr. McDonnell, intentionally took possession of Plaintiff's property for a significant period of time, and/or prevented Plaintiff from accessing the property for a significant period of time, by withholding payment of earned and unpaid commissions, bonuses and expense reimbursements, and diverting those funds to, or otherwise retaining them in, their own name and/or accounts.

149.    Plaintiff did not consent to Defendants' possession of and/or prevention of access to Plaintiff's funds. Plaintiff did not voluntarily transfer her funds to Defendants' possession.

150.    Plaintiff was harmed by Defendants' wrongful assumption of control, dominion, ownership of the funds, and/or prevention of access to the funds.

151.    Defendants' conduct was a substantial factor in causing Plaintiff's harm.

152.    Plaintiff made demands to AEI and its representatives for the return of her property on a number of occasions, including but not limited to: April 16, 17, and 25, 2012; June 10 and 12, 2012; and July 16, 2012. Except for the retroactive payment of certain commissions provided in April 2012, no action has been taken by Defendants to return Plaintiff's property.

153.    As a proximate result of Defendants' actions, Plaintiff has been damaged in an amount to be proven at trial.

154.    The above actions of Defendants were undertaken with fraud, malice and/or oppression, and were done with a conscious disregard of the rights of Plaintiff, and therefore, Plaintiff is entitled to an award of punitive damages against these Defendants in an amount according to proof at trial.

## SEVENTH CAUSE OF ACTION

### (Unjust Enrichment)

### (Against AEI, AEFC, BINKERT and DOES 1-15)

155.    Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 154, inclusive, as though fully set forth herein.

156.    As more fully alleged in the paragraphs above, Defendant BINKERT, and Mr. Gambino, improperly took Plaintiff's clients, associated them with their own account numbers, and improperly excluded Plaintiff from any commissions received from investments made by Plaintiff's clients.

157.    BINKERT and Mr. McDonnell had no justification for these actions.

158.    As a result of BINKERT and Mr. McDonnell's improper receipt of commissions duly owed to Plaintiff, Plaintiff was impoverished and Defendants AEI, AEFC, BINKERT and Mr. McDonnell were unjustly enriched thereby.

159.    As a proximate result of Defendants' actions, Plaintiff has been damaged, and there is an absence of a full remedy at law.

## EIGHTH CAUSE OF ACTION

### (Accounting)

### (Against AEI and AEFC)

160.    Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 159, inclusive, as though fully set forth herein.

161.    During Plaintiff's employment at AEI, her primary means of compensation was via commissions.  Plaintiff's commissions were earned based upon, in part, the value of a client's investment, and were split amongst certain other employees at AEI, including but not limited to, BINKERT, Mr. McDonnell and Mr. Gambino.

162.     As alleged in the preceding paragraphs, Defendant BINKERT, and Mr. Gambino, engaged in the unlawful and improper conversion of certain of Plaintiff's commissions and other wages, and were unjustly enriched thereby.

163.     On at least one occasion, AEI and AEFC's agent, Mr. Rogers, acknowledged the unlawful and improper conversion of Plaintiff's commissions and other wages, and had to provide Plaintiff with retroactive pay to reinstitute her lost wages.

164.     Upon information and belief, the mutuality or complexity of commission, client, and payroll accounts at AEI and AEFC facilitated the ability of BINKERT, Mr. McDonnell, and Mr. Gambino to improperly obtain and retain Plaintiff's commissions and other wages.

165.     AEI and AEFC, as the operators and proprietors of the complex and/or mutual accounts, must provide an accounting in order for Plaintiff to determine whether, and to what extent, she is owed unpaid commissions and other wages.  Specifically, an accounting is required to determine:

> a.  The amount of compensation and other wages Plaintiff would have earned in an equity split with the team, if the oral agreement with BINKERT and Mr. Gambino was honored;
>
> b.  Individual account commissions denied Plaintiff by BINKERT;
>
> c.  Amount of Plaintiff's client accounts improperly diverted by BINKERT, Mr. Gambino, Mr. Rogers, and others;
>
> d.  Amount of secondary debt pieces denied Plaintiff by Mr. McDonnell and others;
>
> e.  Amount of inherited accounts denied Plaintiff;
>
> f.  Amount of Plaintiff's rejected investments;
>
> g.  Amount of Plaintiff's outstanding warrants;
>
> h.  Amount of Plaintiff's back-end compensation; and
>
> i.  Amount of unpaid expenses.

166.    Plaintiff has no other access or means to evaluate the complex and/or mutual accounts, and as a result, an accounting is required.

## NINTH CAUSE OF ACTION

### (Sex Discrimination – Violation of Title VII)

### (Against AEI, AEFC)

167.    Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 166, inclusive, as though fully set forth herein.

168.    Plaintiff, who is female, worked in an almost exclusively male environment, and all of her supervisors and senior management were male.

169.    Plaintiff was as qualified, or more qualified, than her peers at AEI and AEFC, for her position as Investment Adviser.  Plaintiff was consistently one of the top performing advisers in AEI's Chicago office.

170.    During Plaintiff's employment at AEI and AEFC, she was subjected to materially adverse employment actions, taken for unlawful discriminatory reasons.  Specifically, Plaintiff was impermissibly discriminated against due to her sex.

171.    For example, Plaintiff was treated less favorably than similarly situated males with respect to promotion and compensation, as follows:

    a.    Plaintiff never received inherited accounts, although the male brokers in her office frequently received them;

    b.    The Binkert Team's prior 50/50 commission split was not typical, and the other teams at AEI had 60/40 or 70/30 splits;

    c.    Plaintiff's clients were rejected or limited from investing in potentially lucrative opportunities in Fisker, Bloom Energy, and Bright Source Energy, which were offered to the clients of lesser performing male brokers.  This resulted in lost commissions of at least $37,500;

    d.    Less qualified male brokers were given secondary equity pieces, in at least three instances:  (i) Mr. Rogers, a Senior Managing Director, gave an

$860,000 secondary equity piece to male advisers, including BINKERT, Mr. Kozak and Mr. Gambino, but excluded Plaintiff; (ii) AEI's President, Mr. Dockendorf, gave secondary equity pieces carrying the potential for $100,000 in commissions to two male brokers, neither with a track record as strong as Plaintiff's; (iii) BINKERT failed to give Plaintiff a portion of a $12 million dollar secondary equity piece carrying the potential for between $72,000 and $144,000 in commissions. When Plaintiff discovered that she was excluded from a yet another secondary equity piece, she demanded her fair share. Mr. Rogers acquiesced and offered her $500,000 of the multimillion dollar secondary equity piece, but only one day prior to the deadline for her clients to invest, effectively eliminating her chance to participate;

e.  Less qualified male brokers were provided more favorable contract terms than Plaintiff upon hire, including no payback of a draw, and no "Redline" provision (which limited Plaintiff's ability to receive a monthly draw);

f.  Plaintiff was treated less favorably than male brokers with respect to receiving a promotional change in title and awards;

g.  Plaintiff was treated less favorably than male brokers with respect to receiving less time to fill orders and close deals;

h.  Plaintiff was not provided with the same access to support staff as male brokers; and

i.  Plaintiff was treated less favorably than male brokers with regards to her expense account and reimbursement of expenses, of which she is still owed approximately $6,000.

172.  Plaintiff was also subject to false and defamatory statements based upon her sex.

173.  Defendants AEI, AEFC and BINKERT held positions of control over Plaintiff, and were directly or indirectly responsible for the discriminatory actions complained of herein.

174.     Plaintiff was materially harmed by the discriminatory actions complained of herein, which resulted in a severe or pervasive change in the daily conditions of Plaintiff's employment, including a material loss of benefits, delayed promotion, and significantly diminished material responsibilities as compared to similarly situated male advisers.

175.     Plaintiff properly notified AEI and AEFC management regarding the unfair treatment and discriminatory conduct, and requested that her complaint be kept confidential, for fear of retaliation from BINKERT and others.  However, AEI and AEFC management breached that trust, and news of her complaint spread throughout the Chicago office, leading to yet further discriminatory conduct.

176.     As a result of Plaintiff engaging in protected activity, *i.e.*, complaining of discrimination, Defendants AEI, AEFC, and BINKERT took adverse action against her, including, but not limited to, further discrimination, disparagement and termination.

177.     As a proximate result of Defendants' actions, Plaintiff has been damaged in an amount to be proven at trial.

178.     The above alleged actions of Defendants were undertaken with fraud, malice and/or oppression, and were done with a conscious disregard of the rights of Plaintiff, and therefore, Plaintiff is entitled to an award of punitive damages against these Defendants in an amount according to proof at trial.

## TENTH CAUSE OF ACTION

### (Violation of the Fair Labor Standards Act and Title VII)

### (Against AEI and AEFC)

179.     Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 178, inclusive, as though fully set forth herein.

180.     Plaintiff was unlawfully discriminated against during her employment at AEI and AEFC.  Such discrimination included, but was not limited to, denials or delays of promotion privileges and conditions of employment that were unequal to similarly situated males.

181.    For example, Plaintiff was treated less favorably than similarly situated males with respect to promotion and compensation, as follows:

      a.  Plaintiff never received inherited accounts, although the male brokers in her office frequently received them;

      b.  The Binkert Team's prior 50/50 commission split was not typical, and the other teams at AEI had 60/40 or 70/30 splits;

      c.  Plaintiff's clients were rejected or limited from investing in potentially lucrative opportunities in Fisker, Bloom Energy, and Bright Source Energy, which were offered to the clients of lesser performing male brokers.  This resulted in lost commissions of at least $37,500;

      d.  Less qualified male brokers were given secondary debt pieces.  In one instance, AEI's President, Mr. Dockendorf, gave secondary debt pieces carrying the potential for $100,000 in commission to two male brokers, neither with a track record as strong as Plaintiff's.  In another instance, Mr. Rogers, a Senior Managing Director, gave an $860,000 secondary debt piece of Bloom Energy to male advisers, including BINKERT, Mr. Gambino, and Mr. Kozak, but excluded Plaintiff;

      e.  Less qualified male brokers were provided more favorable contract terms than Plaintiff upon hire, including no payback of a draw, and no "Redline" provision (which limited Plaintiff's ability to receive a monthly draw);

      f.  Plaintiff was treated less favorably than male brokers with respect to receiving a promotional change in title and awards;

      g.  Plaintiff was treated less favorably than male brokers with respect to receiving less time to fill orders and close deals;

      h.  Plaintiff was not provided with the same access to support staff as male brokers; and

     i.   Plaintiff was treated less favorably than male brokers with regards to her expense account and reimbursement of expenses, of which she is still owed approximately $6,000.

182.    Specifically, Plaintiff received compensation and other wages unequal to the male advisers at AEI and AEFC, who held similar positions and performed similar job duties as Plaintiff, requiring equal or less skill and responsibility.

183.    By denying Plaintiff equal wages, Plaintiff's employer, Defendants AEI and AEFC acted on the basis of unlawful discrimination.

184.    As a proximate result of Defendants' actions, Plaintiff has been damaged in an amount to be proven at trial.

185.    The above alleged actions of Defendants were undertaken with fraud, malice and/or oppression, and were done with a conscious disregard of the rights of Plaintiff, and therefore, Plaintiff is entitled to an award of punitive damages against these Defendants in an amount according to proof at trial.


**<u>ELEVENTH CAUSE OF ACTION</u>**

**(Sexual Harassment – Violation of Title VII and IL Human Rights Act, 775 ILCS 5/2-102)**

**(Against AEI and AEFC)**

186.    Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 185, inclusive, as though fully set forth herein.

187.    During Plaintiff's employment at AEI and AEFC, she was demeaned, harassed and defamed due to her sex.

188.    For example, Mr. Capra, Mr. Kozak and Mr. McDonnell initiated false rumors about Plaintiff's sexual relationships with her clients as a basis for her substantial business. These unwelcome rumors continued for months and created an intimidating, hostile and/or offensive working environment.  Plaintiff was humiliated and the constant need to redress these

rumors with other employees and AEI and AEFC management, interfered with Plaintiff's work performance.

189.    Significantly, Mr. Kozak and Mr. McDonnell were Plaintiff's supervisors, and AEI and AEFC management failed to exercise reasonable care to prevent and promptly correct the sexual harassment, despite Plaintiff's complaints.  The harassing conduct complained of herein was committed during and within the scope of their employment with AEI and/or AEFC, and upon information and belief the existence of such a harassing environment furthered the interests of AEI and AEFC.

190.    As a proximate result of Defendants' actions, Plaintiff has been damaged in an amount to be proven at trial.

191.    The above alleged actions of Defendants were undertaken with fraud, malice and/or oppression, and were done with a conscious disregard of the rights of Plaintiff, and therefore, Plaintiff is entitled to an award of punitive damages against these Defendants in an amount according to proof at trial.

**TWELFTH CAUSE OF ACTION**

**(Defamation Per Se – Slander, 740 ILCS § 145/1)**

**(Against AEI, AEFC, and DOES 1-15)**

192.    Plaintiff hereby refers to and incorporates herein by this reference paragraphs through 191, inclusive, as though fully set forth herein.

193.    Pursuant to Illinois law, 740 ILCS § 145/1, "if any person shall falsely use, utter or publish words, which in their common acceptance shall amount to charge any person with having been guilty of fornication or adultery, such words so spoken shall be deemed actionable, and he shall be deemed guilty of slander."

194.    Mr. Capra, Mr. Kozak, and Mr. McDonnell falsely uttered the following words, thereby charging Plaintiff as guilty of fornication or adultery:

a. On April 25, 2012, Plaintiff learned that Mr. Kozak and Mr. Capra told at least one other co-worker that she "sleeps with clients for her business," and that Mr. McDonnell stated she "flirted" for her business. These statements were false.

b. On May 25, 2012, Mr. Kozak stated that Plaintiff "flirted" for her business, and that she "does nothing" at work. These statements were false.

c. On September 4, 2012, Plaintiff again heard the false rumor that she was "sleeping" with clients for business.

195. Upon information and belief, Mr. Capra, Mr. Kozak and Mr. McDonnell all held supervisory positions with respect to Plaintiff, and made the defamatory statements to further AEI and AEFC's interests.

196. The false and defamatory statements made by Mr. Capra, Mr. Kozak and Mr. McDonnell, were made with actual malice, and without knowledge of their falsity, or with reckless disregard as to their veracity. Plaintiff is entitled to an award of punitive damages against these Defendants in an amount according to proof at trial.

197. As a result of Defendants' actions in connection with the false and defamatory statements made by Mr. Capra, Mr. Kozak and Mr. McDonnell, Plaintiff suffered damages, including mental anguish, personal humiliation, impairment of personal and professional reputation, and decreased standing in the community, in an amount to be proven at trial.

## THIRTEENTH CAUSE OF ACTION

### (Retaliatory Discharge)

### (Against AEI, AEFC, and BINKERT)

198. Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 197, inclusive, as though fully set forth herein.

199. As discussed in detail in the preceding paragraphs, during Plaintiff's employment at AEI and AEFC, she was unfairly subject to Defendants' unlawful discriminatory acts with

respect to compensation, promotion, and other employment opportunities. Plaintiff was also subject to a hostile work environment due to sexual harassment.

200.     Plaintiff properly notified AEI and AEFC management regarding the unfair treatment and discriminatory conduct, as well as the sexual harassment, and requested that her complaint be kept confidential, for fear of retaliation from BINKERT and others. However, AEI and AEFC management breached that trust, and news of her complaint spread throughout the Chicago office, leading to yet further discriminatory conduct.

201.     As a result of Plaintiff engaging in protected activity, *i.e.*, complaining of discrimination and sexual harassment, Defendants AEI, AEFC, and BINKERT, along with Mr. Kozak and Mr. McDonnell, took adverse action against her, including, but not limited to, further discrimination, disparagement and termination. Plaintiff was involuntarily terminated on November 12, 2012, and was not asked to stay on, unlike certain of her male colleagues, including BINKERT. Such actions are a violation of Illinois public policy.

202.     As a result of Defendants' adverse employment action, Plaintiff has suffered mental anguish, lost wages, and  has been damaged in an amount to be proven at trial.

203.     The above alleged actions of Defendants were undertaken with fraud, malice and/or oppression, and were done with a conscious disregard of the rights of Plaintiff, and therefore, Plaintiff is entitled to an award of punitive damages against these Defendants in an amount according to proof at trial.

## FOURTEENTH CAUSE OF ACTION

### (Failure to Supervise)

### (Against AEI, AEFC, and DOES 1-15)

204.     Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 203, inclusive, as though fully set forth herein.

205.     Defendants AEI, AEFC, individually and through their agents, held a supervisory and/or controlling position over Plaintiff, and had a duty to supervise their employees, including but not limited to, BINKERT, Mr. Capra, Mr. McDonnell, Mr. Gambino and Mr. Rogers.

206.    As alleged in the preceding paragraphs, BINKERT, Mr. Capra, Mr. McDonnell, Mr. Gambino and Mr. Rogers, committed discriminatory, fraudulent, and otherwise unlawful and improper acts against Plaintiff, during and/or in the course of their employment at AEI and/or AEFC.

207.    Defendants AEI and AEFC negligently failed to supervise BINKERT, Mr. Capra, Mr. McDonnell, Mr. Gambino and Mr. Rogers.  Such negligence continued even after Defendants AEI and AEFC knew, or had the duty to know, of the behavior of their employees complained of herein, in part because Plaintiff brought her complaints to AEI and AEFC's attention.

208.    Defendants AEI and AEFC had the power and/or ability to control and/or influence the affairs of BINKERT, Mr. Capra, Mr. McDonnell, Mr. Gambino and Mr. Rogers. Their negligence and failure to supervise proximately caused Plaintiff's injuries, including, but not limited to, lost compensation and wages, lost future compensation and wages, and loss of reputation.

209.    As a proximate result of Defendants' actions, Plaintiff has been damaged in an amount to be proven at trial.

## FIFTHTEENTH CAUSE OF ACTION

### (Respondeat Superior)

### (Against AEI and AEFC)

210.    Plaintiff hereby refers to and incorporates herein by this reference paragraphs 1 through 209, inclusive, as though fully set forth herein.

211.    At all relevant times herein, AEI and AEFC had an agency and/or master-servant relationship with BINKERT, Mr. Capra, Mr. Kozak, Mr. McDonnell, Mr. Crowe, Mr. Daubenspeck, Mr. Dockendorf, Mr. Gambino, Mr. Rogers, and DOES 1-15.  As alleged in the preceding paragraphs, each of these individuals were employees of AEI and AEFC, and most served in a senior supervising capacity.

212. The discriminatory, fraudulent, and otherwise unlawful and improper actions of the Defendants alleged in the preceding paragraphs, including but not limited to: fraud in the inducement, breach of contract, interference with prospective economic advantage, violations of state and federal equal pay and discrimination laws, conversion, unjust enrichment, sex discrimination, sexual harassment, and slander, were conducted within the scope of BINKERT, Mr. Capra, Mr. Kozak, Mr. McDonnell, Mr. Crowe, Mr. Daubenspeck, Mr. Dockendorf, Mr. Gambino, Mr. Roger, and Does 1-15's employment with AEI and AEFC.

213. As a result of the Defendants' discriminatory, fraudulent, and otherwise unlawful and improper actions, Plaintiff suffered damages in an amount to be proven at trial, and for which AEI and AEFC are primarily and vicariously liable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff asks the Court:

A. To enter judgment in favor of Plaintiff and against Defendants;

B. To order Defendants AEC and AEFC to make an accounting of all the commissions and expenses paid and owing to Plaintiff, from February 2009 to November 2012;

C. For reasonable attorney's fees and costs of this action, in part pursuant to the Illinois Attorneys Fees In Wage Actions Act, 705 ILCS 225/1, and Title VII;

D. For punitive damages;

E. Such other and further relief as may be just in law and in equity.


Dated: August 6, 2014


/s/ Neil Kelley

Neil Kelley (ARDC 6306308)
208 S Jefferson St. Ste 204
Chicago, IL 60661

Attorney for Plaintiff Lisa Nicole Julin